Good morning, counsel. Good morning. Can you hear me? Yes. Edie Cunningham v. Mr. Smith, I'd like to reserve three minutes and I will watch my time. All right. This case came down to whether it was realistic to make a lot of money in Las Vegas as an escort without engaging in illicit sex. The government's experts said no, that escorting and prostitution are really the same thing. That testimony needed to be challenged. In addition, the failure to object to the use of the moniker P and another individual's conviction for sex trafficking compounded the prejudice. I'll first address the expert issue. Under the circumstances of this case, the failure to consult with an expert, and really to call an expert, constituted deficient performance. Counsel needed to investigate the prevalence of legal escorting in Las Vegas. Can I ask, counsel, so I take the government's argument to be that in this case defense counsel was able to effectively cross-examine the government experts and have both of them concede that there could be legal escort services. And trial counsel was able to argue in opening and closing that these conversations related to legal services. So why in this case was there a need to investigate and put on a defense expert? Well, the experts did not concede much on cross. All they said was that it was theoretically possible. One said she had never seen it in 13 years and it's just a name that you slap on escorting, excuse me, prostitution to make it not seem so bad. The other one said I've seen it a handful of times in 18 years. But Dr. Brents, an investigation would have revealed that it was actually quite common in Las Vegas. Dr. Brents opined many escorts in Las Vegas do not have sex. So cross-examination was not what was really needed. Also, this Court has said in Valencia-Lopez, page 901, note 8, that cross-examination is not an effective way to challenge the reliability of expert testimony. The testimony If expert testimony is going to be put on, it needs to be challenged before the jury even hears it. So here Can I ask you this? So I take it your argument is the expert testimony would have been helpful to describe its prevalence in Las Vegas, that it wasn't a rare thing. Why would that matter in this context if the jury got to hear the conversations and they could weigh for themselves whether the conversations with the defendant and Vanessa talked about illicit sexual services or not? Why would the prevalence of escort services in Vegas matter when the jury is keyed in on what was happening in these conversations? Well, Your Honor, my client always said I want you to get out of the notion that you have to have sex or do illegal things to make a lot of money in Las Vegas. Las Vegas is a different kind of place. People will pay a lot of money to be seen with a beautiful young woman, to go out to dinner. And this is exactly what Dr. Brent's declaration confirmed. It was the undercover agent posing as Vanessa who always brought the conversation to the possibility of illicit sex. And, of course, my client couldn't control what this person did once she got to Las Vegas. But he was trying to encourage her that, look, you can make a lot of money here without doing it. But when the government's experts said, really, there's no such thing as legal prostitution — excuse me, legal escorting, that everything that is escorting is really prostitution, then, of course, the jury is going to draw the inference from those conversations that he's talking about, in all likelihood, talking about illegal prostitution. Juries are instructed that acquittal is only appropriate if there is a reasonable probability of innocence. And the experts were saying that just wasn't reasonable, that maybe this was theoretically true, but it was not to be believed. And the other reason that it wasn't sufficient to cross was that, in closing, the government was able to argue, well, you know, you heard the defendant talk about escorting. Well, our expert, DeCofle, she told you what escorting really is. And then, as you say, defense counsel did argue vigorously in closing argument. But then in rebuttal, the government came back and said, you know, he wants you to rely on your common notions. We put on experts who told you what was going on here and what these terms mean. So in the context of this case, when there was no risk at all to investigating the prevalence of legal escorting in Las Vegas, it was clear from the outset that it was going to be the central issue of the case, because it came down to what those words in those messages and recordings meant. And — And what's the distinction between count one and count two that makes the, you know, the quantum of evidence that the jury found him not guilty of that one, but guilty on count one? Count two required the jury to find, beyond a reasonable doubt, that he enticed or persuaded Vanessa to go to Las Vegas. And, you know, it was her — well, first of all, she's the one — it was the undercover agent targeting my client, friending him on Facebook, that started the whole thing. And then when my client would seem to lose interest in these  So I guess the question is, then, this issue of the expert witness, you know, whether or not escorting can mean prostitution or is legal, that doesn't affect count two, right? No, because the jury — it didn't really matter. The issue there was whether he enticed or persuaded her to go. Okay. Because it could — it could affect the prejudice prong, right, if all the evidence is overwhelming on — in count one. I just wonder why they found him not guilty in count two — oh, not guilty in count two. And I do think that's relevant to the prejudice prong. I think that it shows that the jury had concerns about this case. And if they had had evidence that legal escorting was a realistic possibility in Las Vegas and making a lot of money on it, there is more than a reasonable probability that at least one juror would have harbored a reasonable doubt about count one. And that's all that we need to show to establish prejudice. But if the — if enticement is the — is what distinctions — distinguishes count one and count two, then I'm not sure that really matters. Well, I — well, I understand your point. I — all I'm saying is that I think the jury, if they had had the evidence to work with, or if they — or, alternatively, if they — if the government's experts had not been allowed to testify that escorting and prostitution are the same thing, then it is likely that my client would not have been convicted. And we do not have to show that it's likely, but I think it is likely under these circumstances. And we've certainly shown a nonspeculative possibility that at least one juror would have harbored a reasonable doubt in the absence of the government's expert testimony, or if an expert such as Dr. Brents had testified that, indeed, many escorts in Las Vegas do not have sex and they make a very good living at it. You were going to bring up the use of the word pee in that message to him from — from someone else. I had a question about that. The government introduced evidence that the defendant had himself posted these various memes about pimps and prostitution. So why — why would this — you know, multiple messages related to that. Why — why would this particular message and the letter P be — like, move the needle in any kind of discernible way? Well, Your Honor, I agree that it's a small point, but it could have took the scales. I think I've — I included it here as more part of the cumulative error analysis because this was a close case and something like that could have took the scales. And I think under the rationale of Jason Smith, it clearly was offered to prove the truth of the matter asserted. And I would also note — Can I ask about that? Because the — the panel on direct appeal found no error because it could have been used not for the truth of the matter asserted, but to — but to prove the truth of the matter asserted. Was this issue properly before us? Your Honor, the court of — on direct appeal, this Court did not address this specific issue. This is hearsay within — within another out-of-court statement. And what the Court ruled was that that larger out-of-court statement, hey, I just — this person seems like she might be one of them people, that that was admitted for a non-hearsay purpose. But if you go back and look at the decision, they didn't even mention or touch on the hearsay within the hearsay, which is what I'm focusing on here. And your — Counsel, the memes that the defendant posted, did any of them identify him — did he identify himself as P in any of those? No, Your Honor, not that I recall. And I would — to place those memes in context, I think there were something like 500 memes that they found, and a handful of them arguably could relate to prostitution. And even the agent conceded that these terms used in these memes were prevalent in hip-hop culture and music. So, you know, the government hones in on just a few of the memes, but by far the majority of the memes were positive and uplifting and had nothing to do with prostitution. Could you briefly discuss the reference to someone else who was in the messages who was identified as having been convicted of trafficking? Yes, Your Honor. There was no reason to bring that in. I mean, the government argues in this appeal that they were just offering it to show why these undercover cops targeted my client. I believe the Mitchell Moolah post was more than sufficient. I have concerns about that use. I didn't challenge it, but that in itself is concerning. But certainly to throw in that one of the other people that was tagged in this post was convicted of human trafficking, again, that just piles on. And even the district court, you know, when he heard that, he called a sidebar and said, don't you want to make a 403 objection? And counsel said, we'll deal with it in closing. Well, he didn't deal with it in closing. And he could have filed a motion to eliminate or... Well, counsel, he did deal with it in closing. He said that anyone can be tagged. And he used this example of if an FBI agent were tagged in some sort of way and they had no control over it. I mean, it may not have been effective in your mind, but he did deal with it in some way, didn't he? Well, that's the Mitchell Moolah... But did he deal with the 403 aspect of it? That's the problem. Exactly, Your Honor. He didn't deal with the other person who had been convicted of trafficking. He dealt with the Moolah post, but not the fact that somebody else who was tagged had been convicted, which is just going to invite the jury to say, well, if somebody else who was tagged in this post did it, then this person must have done it, too. You know, I can understand why they didn't touch on it in closing. I don't know. I guess the argument is he has no control over someone else tagging him in any message. And so, therefore, there's no reason to connect him in any associational way with anything about that post. I understand. I understand. I'd like to reserve... I think it's the government connected him with the person. Even if there may not be a reason to, the government connected him with that person. And so the jury is left with the impression that birds of a feather flock together because this person was convicted of trafficking. We have this similar type of case against the defendant.  So I think that's why the judge had the concern about 403 that the attorney didn't follow up on. Yes, Your Honor. And if I may reserve my time. All right. Thank you, counsel.  Good morning, Your Honors. Good morning. May it please the Court. My name is Bridget Minder. I represent the United States. The jury found defendant guilty because, in this Court's words, there was extensive evidence of guilt. That extensive evidence included hundreds of Facebook and text messages that the defendant exchanged with Vanessa, an undercover agent. It also included defendant's Facebook messages, contemporaneous Facebook messages, with a woman named Bunny Jordan, who was actively engaging in prostitution and who defendant was also trying to convince to come to Las Vegas and work with him. It included unchallenged testimony, testimony that's not challenged in this appeal by law enforcement experts. Excuse me. I'm going to confuse experts and escorts. Those words are similar. Sorry about that. Unchallenged testimony from law enforcement experts about how pimps recruit prostitutes. But, counsel, isn't that the point, that the defense attorney should have had an expert to challenge the testimony that was presented by the prosecution? Judge Rawlinson, as I understand the defendant's appeal and their 2255, they're only challenging a specific portion of the testimony, and that is about the prevalence of legal escorting in Las Vegas. There's been no challenge to the bulk of expert testimony, which is about the techniques that pimps use to recruit prostitutes. Detective DesCouffle and I believe Detective Rousseau testified about how pimps would start by flattering a young woman and talk about how they could come and try dancing or escorting, using words to disguise what becomes prostitution. Well, that's part of the expert testimony that would have been proffered, is whether or not it's escort services or prostitution services that were being solicited. Your Honor, as I understand the defendant's arguments and Dr. Brent's affidavits, their purported sex industry expert, it is specific to the prevalence of legal escorting. Dr. Brent doesn't talk at all about how pimps recruit prostitutes. So that testimony is unchallenged, and this Court must take it. I actually don't know what would have transpired if the defense expert had been allowed to testify. I'm from Las Vegas, so I have a little bit of familiarity with it, that there is an academic study of prostitution, the sex industry in Las Vegas. So the expert could have opined on any or all of this, depending on what questions were asked. We don't know because the expert wasn't the defense attorney said he never even thought about calling an expert. True, Your Honor. The defendant filed, along with his reply in the 2255 briefing, just a single statement by the Defendant's Trial Counsel saying he did not consider calling such an expert, but that doesn't render his performance ineffective. It was a reasonable strategy under Strickland, Harrington, and this Court's authority to pursue cross-examination of the government's experts rather than present his own experts. As Harrington made clear... Can I ask, I mean, one of your arguments in your briefing is that there could have been downsides to putting on a defense expert with cross-examination. What kind of downsides might have emerged in your view? Several, Judge Sanchez. For example, one, this is a paid expert. Assuming it's Dr. Brents, this is a paid expert who has long advocated for the legalization of prostitution. So there may be credibility issues. But more importantly, it's hard to think that an expert like Dr. Brents or someone else could deny that many of the statements that the Defendant made, for example, in his recorded phone call, were inconsistent with an intent to engage in prostitution. And we've quoted these in our brief. It's the Defendant... Well, counsel, the problem with some of those statements is they were directed by the — this was not the typical grooming situation. Most of the statements regarding prostitution were initiated by the undercover officer. And so it's a little bit different than a scenario where the person who's seeking to entice someone or seeking to groom someone is initiating the conversation about prostitution. Judge Rawlinson, I take your point, but I think that there are places in the record where it's clear that the Defendant is the one who's jumping to prostitution. And importantly, the Defendant doesn't deny that he's interested in prostitution. And let me — if the Court will allow me, let me give you a few examples. At 4 ER 591, this is one of the Facebook messages that the Defendant is exchanging with Vanessa. And she says, I heard pimps hit their girls. And his response right away is, I don't even like the word pimp. It's not, I wouldn't be your pimp, I'm not talking about prostitution. It's, I don't like the word pimp. And that could have two meanings. It could be, I don't like that because that's not what I do. Or it could be, I don't like that because that's what I do and I don't want to be called. So that doesn't necessarily mean he's wanting her to be a prostitute. And the Defendant's trial counsel vigorously argued that in his opening and in his closing. And it was for the jury to decide, based on the totality of the evidence whether or not the Defendant's intent was for Vanessa to engage in prostitution. And Judge Bumate asked my opposing counsel a question about the difference between count one and count two. And I think that that sort of exemplifies what we're looking at here. The jury unquestionably found that the Defendant intended for Vanessa to engage in prostitution. The difference between count one and two is who was the driving force behind that? Whose idea was it? And they couldn't reach a verdict on count two. So some jurors had some questions about that. But as to count one, they looked at the totality of the evidence as this court must, excuse me, when deciding whether Defendant was prejudiced. And all of the evidence they saw, the Facebook messages, the recorded phone call. The messages with Ms. Jordan, with Bunny Jordan, are particularly damning. This is somebody, these messages are contemporaneous to when the Defendant is talking with Vanessa. So he's messaging at least two women at the same time. Ms. Jordan is actively engaging in prostitution. There's no question about that. He's talking about, come to Las Vegas, I want to get you in a service. And she says, hey, I'm already on P411, and I'm on XE, and I'm on Backpage. Detective Day-Couffle, one of the government's experts, our blind expert, testified that P411 and XE are basically Yelp for prostitutes. These are services where prostitutes advertise themselves. Their clients can list or write reviews, say what practices they'll do, what acts they won't do. Both Detective Russo and Detective Day-Couffle talked about Backpage being a common place where prostitutes advertise. Ms. Jordan's also talking about a trick coming to her hotel room and it being a slow day and making less than $1,000. Now, the Defendant casts this in the light of, you know, Mr. Smith, the Defendant was just trying to help Ms. Jordan get a fresh start. That's not what an objective view of the evidence shows. And I think that's one example of the way in which Defendant's briefs view the record in this case with rose-colored glasses. One of the issues was that, in the R&R, was that the magistrate judge said that if Brentz was to testify, she would have to confront some of the statements made by Mr. Smith and have to concede that they were sexual in nature. Of course, Ms. Brentz provides an affidavit saying that she would not testify that way. What's the government's response to it? Well, I believe that she said she wouldn't testify, or she would testify that Defendant's statements were not consistent with an intent to engage in prostitution. And so I have two responses to that, Judge Bumate. One is that that is ultimate issue type of testimony about what Defendant's intent was or was not, that's not allowable under Rule 704. The second one that I think is important to point out is that Dr. Brentz has not reviewed all of the evidence in this case, and her affidavits make that crystal clear. Her first affidavit that's on 2 ER 93 at paragraph 5, it says that she had only reviewed the Defendant's opening brief from the appeal. My opposing counsel is an excellent writer. When I reviewed her opening brief on appeal, I thought I had a bad case. So, you know, if that's all that Dr. Brentz is reviewing, I can see why she might have felt that way. And her second It's true that her second affidavit doesn't go line by line of what the statements that Mr. Smith said, you know, and doesn't say that that's not consistent with prostitution, right? Correct. Her second affidavit, and she makes clear in that one, and that's at 2 ER 141, paragraph 3, the only additional material that she had reviewed at that point was the judge's report and recommendation and a transcript of the call. She hadn't reviewed the trial transcripts. She hadn't reviewed the Bunny Jordan chats. She hadn't reviewed the Facebook chats. And so it's hard to see how Dr. Brentz's opinion is one that this court should give much credibility to. And clearly the trial court did not, based on her background, some of the positions that she's taken in the past, and the fact that she wasn't sitting in the jury box like the jurors were. She hadn't reviewed all of the evidence in this case. Could you speak briefly about the Mitchell-Muller tag and counsel's failure to object at the time and deal with it in closing and the potential prejudice to that? Yes, Your Honor. So as to effectiveness, first I would note that this was not something that appellate counsel challenged on direct appeal, as you noted. I think that it was relevant and admissible to explain the origins of the How was it relevant that another person had been convicted of sex trafficking? Well, it explains, Judge, why the government reached out to the folks that were tagged in this. There's lots of crazy things on Facebook, right? Lots of I get tagged in stuff from people I went to elementary school with that I do not want to be tagged in. There was a reason why the government reached out. Now, I defense counsel's point that they didn't need it. We can look in hindsight as to whether that was a wise decision and we needed it or not, but that's not the test for ineffective assistance of counsel. But I do — I want to clarify on the prejudice front on this one a couple of things. This was not as significant a moment at the trial as the appellate briefing has built it up to be. I was trial counsel. I was there. Sidebars in this courtroom are common. Those of us who were former prosecutors or practiced or were district court judges know that some judges never have a sidebar during trial, and it's common for some. And this is a courtroom where sua sponte sidebars was not uncommon. An example of that is a sua sponte sidebar during my opening statement at 2ER-175. But counsel, the point on this one is that the judge suggested that there should be a 403 objection. And counsel did not pick up on that hint. If a judge tells you that probably you want to do something, that's a pretty good signal that it's meritorious. I usually try to follow judges' directions as well, Your Honor, and I'm trying not to interrupt you as well, so I apologize for that. I think the judge's real concern here, and this is clear from a reading of the record, was not the 403 concern initially. It was that the government was going to try to use this as a backdoor to get in evidence about the defendant's criminal history. The defendant had some criminal history related to prostitution, I believe an arrest that had not evolved into a conviction, and the judge's concern was whether the government was going to try to get it in that way. And I'm pulling up the... As I understand it from my reading, the district court was asking if there's any evidence of a connection between the defendant and someone else on the tag. So I took it to mean that he was concerned about some sort of associational, you know, aspersion being cast on him. I took it the same way, Judge Sanchez. That's the way that I remember the moment, both at sidebar and at the subsequent questioning. And to address the judge's concern, the government in just a couple questions later, 3 ER 353, said, but just to be clear, Mr. Mitchell Moolah tagged these people. They didn't ask to be included in this post. That's correct. The government was trying to distance the defendant based on the judge's concern at sidebar from that. And I would note just on effectiveness, the trial counsel did object to another person's criminal history. The woman whose car defendant borrowed to drive from Las Vegas to Phoenix, he borrowed a woman's Prius. It was a friend of his. She had arrests and I believe conviction, at least one conviction that was prostitution related. And defense counsel did strategically object to that evidence coming in. So I think while we may have had a different strategy had one of us been defense counsel and Ms. Udall, the government's expert, would have dealt with the issue differently of the Mitchell Moolah post, defendant's trial counsel was strategic about it. He said it on the record. I plan to deal with it in my closing. And he did deal with it in his closing in the way that I think Judge Sanchez recounted about coming up with this hypothetical about the special agent. I see my time is up.  I'd be happy to answer any other questions, but otherwise, the government would ask that the Court affirm the district court's denial of Defendant 2255 as tall claim. Thank you, counsel. Thank you very much. Just a few points to rebut. First of all, neither the jury nor this Court had the full context when reviewing this case in the direct appeal because they did not know that legal escorting is, indeed, quite common in Las Vegas. As to Bunny Jordan, that was extensively discussed in my opening brief, and I think it's important to note that I did review that brief with detailed citations to the record of their communications because that was pertinent to an issue I raised on direct appeal. So, yes, the expert did have that information, and also that needed to be placed in context. If Dr. Brintz had testified at defendant's trial, that would have explained. And again, it was Bunny Jordan. She reached out to him, and he's like, get out of that bad situation. You can make a lot of money escorting in Las Vegas. So very similar thing. The context was needed there. The detectives actually admitted that my client was not acting like a pimp. He was giving Vanessa choice. He wasn't pressuring her. He used his own name and his own contact information. So, again, having the full context that, yes, it was indeed common to make money in Las Vegas as a legal escort was very important. Under these circumstances, my defense counsel either needed to put on its own expert or preclude the government's testimony that escorting and prostitution are interchangeable. And there would have been good basis to do both. The downsides, well, these government experts had the imprimatur of the government. It was crucial, if they were going to be able to testify in that way, to counter it. And Dr. Brintz, as one of you pointed out, said she would have not been forced to agree that what my client said had to do with prostitution. Now, you know, it was the district judge or actually the magistrate who brought that up, but it wouldn't have been damaging because she would not have backed down from her position. Sotomayor, do you think that she was subject to challenge because she advocates for the legalization of prostitution? No, Your Honor. I mean, just the government experts are subject to challenge because they obviously have a bias in favor of the government. I think, you know, Dr. Brintz, and I should point out that the government does not question the truthfulness or accuracy of her affidavit. And she clearly says there are many people who have sex in Las Vegas to make money for that, and there are many people who don't and who make a lot of money without doing anything illegal at all. And that was the key point. All right. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case is submitted for decision by the court.
judges: RAWLINSON, BUMATAY, SANCHEZ